Lynn F. BERNSTEIN, Harvey A. Nathan, Plaintiffs,

v.

UNITED STATES of America, acting by and through its agency, the Internal Revenue Service, Kevin Cox, Robert Freeland, and James Ruark, Defendants.

Nos. 2:97–745–18, 2:97–746–18.

United States District Court, D. South Carolina, Charleston Division.

Nov. 10, 1997.

Charles S. Bernstein, Charleston, SC, for Plaintiffs.

Steven Webster, Washington, DC, for Defendants.

## OPINION AND ORDER

NORTON, District Judge.*

Plaintiffs Harvey Nathan and Lynn Bernstein filed separate actions against the United States and special agents for the Internal Revenue Service based on the conduct of the agents during the search of a business and residence. The defendants moved to dismiss the actions under Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim under the Federal Rules of Civil Procedure due to the Court's absence of jurisdiction over this action. The defendant federal officer alternatively moved for summary judgment based on qualified immunity. Based on the following discussion, the United States is dismissed based on sovereign immunity. Further, the actions are dismissed against the federal officer defendants based on the failure to state a claim, or alternatively, summary judgment is granted based on qualified immunity.

## STATEMENT OF FACT

*Background of Investigation.* The Internal Revenue Service began a criminal investigation of Harvey Nathan following a report by a local accounting practitioner that Nathan may have violated federal tax laws in connection with his personal income taxes and that of his business, Nathan's Deli, Inc. for the years 1991 and 1992. (Brantley Decl., para. 2.)

The accounting practitioner stated that she had performed accounting services for Nathan's Deli, Inc. and Harvey Nathan since May or June 1993 and that Nathan sought her assistance in assembling financial information for an insurance company relating to an insurance claim for damages incurred to a deli location in May 1993. (Brantley Decl., para. 3.)

According to the informant, Nathan specifically requested that she prepare a corrected 1991 and 1992 corporate income tax return for Nathan's Deli, Inc. and compile sales

* [Editor's Note: Judge Duffy signed this order on behalf of Judge Norton.]

figures for the business for the period May 1991 through May 1993. Nathan advised the informant that the 1991 corporate tax return that he had previously filed with the IRS was incorrect because it did not include wholesale income. Nathan told the informant that, in addition to the retail deli, food products and catering services were sold through a wholesale side business and that the income had not been reported on tax returns. (Brantley Decl., para. 4.)

Nathan provided the informant with records of his wholesale/catering income by month for 1991 and 1992, along with the food cost associated with this income. He also gave her the daily income sheets for this period which reflected retail income. According to these records, the 1991 corporate tax return failed to report $164,200 in additional gross receipts and $126,434 in additional net income. Also, the 1992 corporate tax return had not yet been filed, but the records Nathan provided to the informant showed that $183,922 in additional gross receipts and $138,362 in additional net income 1992 were not shown on the corporate financial statements. (Brantley Decl., para. 5.)

Nathan told the informant that he wanted her to prepare tax returns that reflected all income (retail and wholesale), which were to be provided to the insurance company for the business interruption claim. (Brantley Decl., para. 6.) The informant also stated that she later prepared Nathan's individual tax returns for 1991 and 1992, which had been delinquent. The earnings that she reported on his returns were based on the flow-through profits from the SubChapter S corporate returns for Nathan's Deli, Inc. that she had previously prepared for the insurance company. The informant stated that Nathan had also provided copies of these returns to a local bank to refinance his residence. (Brantley Decl., para. 7.)

The informant stated that during September and November 1993, Nathan received notices from the IRS and South Carolina Tax Commission regarding his 1991 personal tax return and 1992 corporate tax return. In November 1993, Nathan and his girlfriend/business partner, Lynn Bernstein, asked the informant to meet with them to discuss his tax problems. At this meeting, Nathan told her that he needed her to prepare new 1991 and 1992 individual and corporate income tax returns for him to file with the tax authorities. Nathan explained that he did not want these new returns to reflect the wholesale/catering income that was shown on the tax returns he submitted for insurance and refinancing purposes. Nathan told the informant that the tax liabilities shown on returns submitted to the insurance company were much higher than he was willing to pay. At this point, the informant contacted the IRS and reported Nathan's conduct. (Brantley Decl., para. 8.)

The Internal Revenue Service Special Agent assigned to the case, Brantley, took the following actions to corroborate the statements. A check of IRS records reflected that Nathan's 1991 and 1992 individual tax returns, along with the 1992 corporate tax return for Nathan's Deli, Inc., had not been filed. A copy of the 1991 corporate return for Nathan's Deli, Inc. in the informant's possession agreed with the return originally filed with the IRS. Copies of income summary sheets and other documentation provided to the informant by Nathan were reviewed. The income sheets supported the informant's statement regarding the additional wholesale business income that Nathan claimed the business made in 1991 and 1992. In addition, copies of the tax delinquency notices provided to the informant from Nathan were reviewed and were consistent with her testimony. Also, copies of the tax returns that she prepared for submission by Nathan to the insurance and mortgage companies were reviewed and agreed in amount to income summary sheets provided by Nathan. (Brantley Decl., para. 9.)

The informant agreed to tape conversations with Nathan and Bernstein to confirm that Nathan wanted her to assist him in preparing erroneous federal income tax returns. During December 1993 and February 1994, the informant made a series of monitored telephone calls to Nathan and Bernstein. In these recorded conversations, Nathan reiterated his instructions to her regarding the preparation of his corporate and

individual income tax returns. (Brantley Decl., para. 10.)

From a December 2, 1993 telephone conversation, the informant asked Nathan if he wanted the corporate tax returns to include the wholesale income or expenses which were shown on the returns prepared for the insurance company, to which Nathan replied, "No, we don't want to show any of the wholesale (figures) in there; We don't want to pay any taxes." Bernstein then told the informant, "We get money back, make sure to do that." (Brantley Decl., para. 11.)

In the same conversation, she told Nathan and Bernstein that both she and they knew that the tax returns were not correct and asked if they had any objections to her not signing the returns (as the preparer). Nathan responded, "No." Bernstein reassured the informant that she should not worry about asking them anything and further explained that she and Nathan felt comfortable with her or else would not be filing false returns. (Brantley Decl., para. 12.) Also in the same conversation, Nathan told the informant, "Just show as much income as you can without having a wild tax liability; that way we can substantiate our existence." (Brantley Decl., para. 13.)

On February 6, 1994, the informant had a recorded conversation with Nathan and Bernstein at Nathan's Deli. At this meeting, she gave Nathan the tax returns that he requested she prepare for the IRS. She also showed Nathan and Bernstein copies of the 1991 and 1992 corporate tax returns she had earlier prepared, at his request, for insurance purposes. The informant explained that the only difference between the returns was that the returns used for insurance purposes included both retail and wholesale income and the returns to be used for tax reporting purposes included only retail income. Nathan reviewed the returns and told her that he wanted the returns with the lower tax liability to be filed with the IRS and state authorities. (Brantley Decl., para. 14.)

On February 8, 1994, Nathan filed the tax returns that reflected the lower tax liabilities with the Internal Revenue Service. (Brantley Decl., para. 15.) Based on the results of

the investigation through March 1994, the Internal Revenue Service determined that there was probable cause that Nathan had filed false individual and corporate income tax returns with the IRS. (Brantley Decl., para. 16.) Special Agent Brantley prepared affidavits in support of search warrants for records believed to exist at Nathan's Deli, Inc. and at the residence and Harvey Nathan and Lynn Bernstein. (Id.)

On March 22, 1994, search warrants and affidavits were presented to and signed by U.S. Magistrate Judge Robert S. Carr for searches of Nathan's Deli, Inc. located at 1836 Ashley River Road, Charleston, South Carolina and the residence and garage of Harvey Nathan and Lynn Bernstein located at 14 Trail Hollow Drive, Charleston, South Carolina. (Brantley Decl., para. 17; copies attached as Exs. 1 and 2 to Brantley declaration.)

*Execution of Search Warrants.* The search warrants were executed on the morning of March 24, 1994 at both the business site of Nathan's Deli and the residence. Agents arrived at both locations at approximately 7:00 a.m. Special Agent Brantley was the team leader for the search at the business site. Upon entering the business, the four IRS agents performed a sweep for weapons and to identify persons present. All customers or employees were asked to leave and the business was closed for the duration of the search (Brantley Decl., para. 18.), which is the established procedure in search warrants involving businesses open to the public. (Bishop Decl., para. 6.)

Harvey Nathan was present at the business site. The agents advised him of his non-custodial rights and he consented to an interview. (Brantley Decl., para. 19.) During the interview, in response to an inquiry about the differing tax returns he submitted to banks, his insurance company and the IRS, he commented, "I screwed up." (Brantley Decl., para. 22.) However, Nathan refused to admit that he had failed to report the income in order to avoid paying taxes. (Id.) Following the interview of Nathan, he stayed at the business until the conclusion of the search. (Brantley Decl., para. 19.) No

requests were made by Nathan or Bernstein for the return of items needed for the ongoing activities of their business. (Brantley Decl., para. 21.)

Special Agents Darlene Fuller, Perry Stalvey, and Edward Skowyz assisted with the search for records at the Nathan's Deli business site. These three agents did not have any contact with Nathan during the search and did not participate in executing the search of the residence. (Brantley Decl., para. 23.)

All records seized were authorized by the search warrant. The search ended at the business site at approximately 11:00 a.m., which was four hours after it commenced. (Brantley Decl., para. 18; Bishop Decl., para. 8.)

Upon notification from the team leader at the residence that it was locked and that there was no response from the residence, Special Agent Brantley informed Nathan that they had a search warrant for his residence. Nathan was advised that entry into the residence would be made with the key, if provided by Nathan, or without the key. Nathan provided the key to his residence, which was taken to the residence by a special agent. During this time period, Special Agent Brantley advised agents at the residence that, according to Nathan, Bernstein was in the residence. The IRS agents did not permit Nathan to notify Bernstein due to safety and record destruction concerns. (Brantley Decl., para. 20; Bishop Decl., para. 7.)

Four IRS Special Agents performed the search of Nathan's and Bernstein's residence. At approximately 7:00 a.m., the agents approached the house. Special Agents Kevin Cox and Robert Freeland knocked on the front door and rang the doorbell. There was no response from inside the residence. Special Agent Ruark, along with other agents, observed the perimeter of the property. There was a dog in the back area of the residence that was barking the entire time the agents were outside the house. The dog also was in a position to prevent an agent from knocking on the back door. (Ruark Decl., para. 3; Wilder Decl., paras. 3, 4.)

Special Agent Brantley informed the agents that Lynn Bernstein was supposedly inside the residence, instructed the agents not to force entry, but rather to wait for a response from inside and to wait for the key. Special Agents Cox and Freeland continued to ring the bell and knock on the door, without any response. (Ruark Decl., para. 4; Wilder Decl., para. 4.)

At approximately 7:25 a.m., a special agent arrived at the residence with a key to the front door. Special Agents Cox and Freeland again knocked on the door and rang the bell. When no one answered, they used the key to open the front door and immediately upon entering the residence they announced with loud voices, "Federal agents with a search warrant, is anybody here?" There was no response. Agents Wilder and Ruark followed them into the residence. Agents Cox and Freeland went upstairs.

Special Agents Wilder and Ruark found the door to a downstairs bedroom closed; they knocked on the door and announced, "Federal agents with a search warrant." (Ruark Decl., para. 6; Wilder Decl., para. 7; Cox Decl., para. 6; Freeland Decl., para. 6.) There was no response from inside the room. (Ruark Decl., para. 6; Wilder Decl., para. 7.) Within twenty seconds, the agents pushed the door open and entered the room with their weapons drawn. (Wilder Decl., para. 7.) Bernstein was sitting up in a bed, fully clothed in night clothing, though her hands were not visible, obscured by the bed covers. Both of the agents spotted an unidentified item under the bed covers near Bernstein. (Wilder Decl., para. 9; Ruark Decl., para. 7.) The two agents told her to get her hands up where they could be seen. (*Id.*) The agents had their weapon drawn, in the ready position, pointed toward the floor, but in Bernstein's direction. (*Id.*) Bernstein reluctantly exhibited her hands, and several times lowered them toward the bed covers. The agents told her several times to raise her hands. (*Id.*)

The agents verbally identified themselves as Special Agents of the Internal Revenue Service and were wearing official raid gear that clearly exhibited that they were law enforcement officers. (Ruark Decl., para. 8;

Wilder Decl., para. 13.) Special Agent Wilder pulled back the bed covers and identified the object in the bed near Lynn Bernstein's hands as a mobile telephone. (Ruark Decl., para. 9; Wilder Decl., para. 10.) The time period within which the weapons were drawn, from the entry into the room until the phone was identified, was less than a minute. (Ruark Decl., para. 10; Wilder Decl., para. 11.)

Lynn Bernstein did not appear to have just been wakened by the entry, nor did she appear to be surprised, alarmed or hysterical. (Ruark Decl., para. 10; Wilder Decl., para. 12.) Special Agent Wilder asked Lynn Bernstein if she wanted a housecoat, and retrieved the housecoat after Bernstein approved. (Ruark Decl., para. 12; Wilder Decl., para. 13.) The agents inquired as to the presence of weapons and valuables. There were valuables in a jewelry box, which was located, inspected and then given to Bernstein. Bernstein was then escorted to the living room. (Ruark Decl., para. 13; Wilder Decl., para. 13.) The total time in the bedroom was less than ten minutes. (Ruark Decl., para. 14; Wilder Decl., para. 15.)

The agents then completed the search and then departed the residence at approximately 9:30 a.m., thus completing the search in approximately two hours. (Ruark Decl., paras. 15, 16; Wilder Decl., para. 16; Freeland Decl., para. 7.)

*Post-search investigation.* Following the searches, Special Agent Brantley analyzed financial records to determine the disposition of the additional wholesale/catering income purported to have been made. Daily sales sheets, bank deposits for numerous banking accounts, general ledgers and various asset records were analyzed for a three-year period. Records were found which supported the alleged unreported income for 1991; however, supporting documentation was not found for 1990 or 1992. (Brantley Decl., para. 24.)

In August 1996, Nathan dismissed his attorneys and was interviewed by Special Agents Lisa Brantley and Kevin Cox. Nathan was confronted with the fact that two sets of income tax returns were prepared for himself and for his business for the same years, which reported vastly different amounts of income. The tax returns reflecting the lower income were filed with the IRS and the tax returns reflecting the higher income were filed with his insurance company and banks. Nathan admitted that he had made misrepresentations about having additional wholesale income and had falsified documents submitted to his insurance company to obtain a larger settlement. Nathan also advised that the records which indicated additional unreported income for 1991 were also falsified. He explained how he falsified the sales documents and tax returns provided to the insurance company and how he had actually reported the correct sales figures to the IRS. (Brantley Decl., para. 25.)

Nathan was subsequently indicted on February 15, 1996 for three counts of Title 18, U.S.C. Sections 1343 and one count of Title 18, U.S.C. Section 1014 violations. (Brantley Decl., para. 27.) On July 19, 1996, Nathan pleaded guilty to one count of wire fraud. (Brantley Decl., para. 28.)

## DISCUSSION

 *The United States and the federal officers in an official capacity.* It is well established that the United States, as sovereign, may not be sued without its consent, and the terms of its consent define a court's jurisdiction. Where the United States has not consented to suit, the court lacks jurisdiction over the subject matter of the suit and dismissal of the action is required. *FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *United States v. Dalm,* 494 U.S. 596, 608, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990); *Armendariz–Mata v. U.S. Dept. of Justice, Drug Enforcement Administration,* 82 F.3d 679, 681 (5th Cir.1996); *Wilkerson v. United States,* 67 F.3d 112, 118 (5th Cir.1995). Waivers of sovereign immunity are to be strictly construed. *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Wilkerson v. United States,* 67 F.3d at 118. The United States may condition its consent as it deems appropriate, and that consent is strictly construed. The burden is on a plaintiff to demonstrate compliance with the terms of the statute under which the United

States has consented to be sued. *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *United States v. Sherwood*, 312 U.S. 584, 586–88, 590, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); *Harvey Constr. Co. v. Robertson–Ceco Corp.*, 10 F.3d 300, 303 (5th Cir.1994).

Moreover, the doctrine of sovereign immunity extends to agents and officers of the United States to the extent they are sued in their official capacities. *Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963); *Spalding v. Vilas*, 161 U.S. 483, 498–99, 16 S.Ct. 631, 40 L.Ed. 780 (1896); *Bank One, Texas v. Taylor*, 970 F.2d 16, 32–33 (5th Cir.1992), *cert. denied*, 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993); *Williamson v. U.S. Dept. of Agriculture*, 815 F.2d 368, 373 (5th Cir.1987); *Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1225–26 (5th Cir.1976). Here, plaintiffs purported to sue several IRS employees in their official capacities (in addition to their individual capacities) in connection with the execution of a search warrant to investigate suspected tax fraud. (Vol. 3, R. 1 at 14–17.) To the extent that plaintiffs sued the IRS defendants in their official capacities, the remedy would be against the United States and plaintiffs have to show a waiver of sovereign immunity. *Harvey Constr. Co.*, 10 F.3d at 303.

Plaintiffs did not identify any statutory provision that waived sovereign immunity in the instant case. General jurisdictional statutes, such as 28 U.S.C. § 1331, merely confer jurisdiction to hear the subject matter of a case without waiving sovereign immunity. *Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380, 1385 (5th Cir.1989); *Clemente v. United States*, 766 F.2d 1358, 1363 (9th Cir.1985), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 881, 88 L.Ed.2d 917 (1986); *Holloman v. Watt*, 708 F.2d 1399, 1401 (9th Cir.1983), *cert. denied*, 466 U.S. 958, 104

S.Ct. 2168, 80 L.Ed.2d 552 (1984). Based on the foregoing, the action against the United States and the federal officer defendants, in their official capacities, is dismissed.

*Failure to State a Claim Against the Federal Officer Defendant in Their Individual Capacities.* In certain circumstances, a suit for damages may be maintained against Government officials, in their individual capacities, for violations of clearly established constitutional or statutory rights of which a reasonable person would have been aware. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Vander Zee v. Reno*, 73 F.3d 1365, 1368 (5th Cir.1996).[1] The burden is on the plaintiff to demonstrate a violation of clearly established law. *Davis v. Scherer*, 468 U.S. 183, 193, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

In a *Bivens* suit, the Fourth Circuit requires more particularized, "heightened pleading" of how plaintiff's constitutional rights were violated. *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 764 (4th Cir.1990). "[C]omplaints against federal officials for constitutional tort causes of action must clearly set forth such facts that will show the existence of the clearly established constitutional right and what the defendants did to violate it—'who did what to whom and why.'" *Awalt v. Whalen*, 809 F.Supp. 414, 416 (E.D.Va.1992).[2]

The Supreme Court has held that plaintiffs must do much more than simply allege that a provision of the Bill of Rights has been violated. For instance, simply alleging a violation of the Due Process Clause is not enough.

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant,

---

**1.** No *Bivens* action lies against federal agencies, such as the IRS. *FDIC v. Meyer*, 510 U.S. at 485–86.

**2.** The Fourth Circuit has indicated that it continues to require heightened pleading in constitutional tort cases against individual government agents, not withstanding the Supreme Court's

decision to the contrary with respect to municipalities which are defendants in 42 U.S.C. § 1983 cases. *Jordan v. Jackson*, 15 F.3d 333, 340 n. 5 (4th Cir.1994), citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [I]n the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), citing *Mitchell v. Forsyth,* 472 U.S. 511, 535 n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) and *Malley v. Briggs,* 475 U.S. 335, 344–345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) [*internal citations omitted*].

The Fourth Circuit has held that when determining whether the specific right allegedly violated was clearly established, "the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992); *see also Gooden v. Howard County,* 954 F.2d 960, 964 (4th Cir. 1992) (en banc)

The Fourth Circuit, in discussing probable cause in the context of search warrants, stated: "The case law of the Fourth Circuit clearly evidences this Court's general willingness to affirm, under a highly deferential standard of review, a magistrate's finding of probable cause." *Simmons v. Poe,* 47 F.3d 1370, 1378 (4th Cir.1995) (citations omitted). The court added that "[t]his Court has always applied a highly deferential standard of review in considering the sufficiency of a finding of probable cause by a magistrate." *Id.*

The court then restated its analysis from an earlier decision (*United States v. Jones,* 31 F.3d 1304 (4th Cir.1994)), which discussed the necessary indicia of probable cause to justify a search:

In order to establish probable cause, the facts presented to the magistrate need only *"warrant a [person] of reasonable caution in the belief" that contraband or evidence of a crime will be found in the place to be searched.* The probable cause standard "does not demand any showing that such a belief be correct or more likely true than false." The decisions of the Supreme Court, as well as our more recent efforts, consistently establish that "[g]reat

deference is to be given a magistrate's assessment of the facts when making a determination of probable cause." Applying this level of deference, our inquiry is directed to whether the magistrate had a "substantial basis" for his conclusion that probable cause existed.

(*Simmons,* at 1378–79(emphasis added)); *see also United States v. Clyburn,* 24 F.3d 613, 617, 618 (4th Cir.1994), *cert. denied,* 513 U.S. 907, 115 S.Ct. 274, 130 L.Ed.2d 192 (1994) (finding that a magistrate's determination of probable cause "should be paid great deference by reviewing courts" and is supported when there is a "fair probability" that the thing for which the police are searching will be found in the place to be searched), citing to *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590–91, 21 L.Ed.2d 637 (1969), and *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

The Supreme Court has concluded that to determine whether probable cause exists, the magistrate is required to make a "practical, common sense decision" whether there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). This decision is made based upon the "totality of the circumstances." *Id.* Doubtful cases are to be resolved in favor of upholding the warrant. *See United States v. Sleet,* 54 F.3d 303 (7th Cir.1995) (citing *Gates,* 462 U.S. at 237). A search warrant may issue even in the absence of direct evidence linking criminal objects to a particular site. *Sleet,* 54 F.3d at 306 (citing cases). The magistrate is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense. *Id.* A magistrate judge's determination that probable cause existed is subject to "highly deferential review" and "should be overturned only if there is no substantial basis for concluding that probable cause existed." *Simmons,* 47 F.3d at 1378, 1380.

The totality of the circumstances overwhelmingly indicated probable cause to believe both that a crime had been commit-

ted, and that evidence of the crime would be found at the places searched in this case. *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Accordingly, there is no basis for overturning the magistrate judge's determination, or for finding that the federal agents acted in violation of the Fourth Amendment.

▬ Plaintiffs allege that the defendants violated their rights guaranteed by the Fourth and Fifth Amendments to the United States Constitution, but the allegations fail to state a claim. Nathan complains about the breadth of the criminal investigation prior to the issuance of search warrants. A subject of a criminal investigation does not have a constitutional right to have a criminal investigation performed in a desired manner. Nathan also complains about having his deli business site closed for a few hours while federal agents conducted a search. There is certainly no constitutional right to not have federal agents temporarily close a business site pursuant to a search warrant in a criminal investigation. Nathan also complains about not being permitted to call his associate, Lynn Bernstein. Nathan had no constitutional right to call a friend to warn that person that their residence is about to be searched. His action fails to state a claim and must be dismissed.

▬ Bernstein complains about being awakened by the entry into a residence's bedroom by federal agents who were securing the residence during a search incident to executing a warrant. There is no constitutional right to be alerted in advance of a search of a residence, nor any right to not have federal agents secure a residence before conducting a search. In this circumstance, a protective sweep for the execution of a search based on a warrant, there is no constitutional right to not have a federal officer display his weapon and demand that the person not move. Her action also fails to state a claim.

Without restating every fact concerning the investigation, Nathan obtained assistance from an accounting practitioner to prepare two different sets of federal tax returns for each year. He provided her with records of his wholesale/catering income by month for 1991 and 1992, which indicated that the 1991 corporate tax return failed to report $164,200 in additional gross receipts and $126,434 in additional net income and that the 1992 corporate financial statements for Nathan's Deli had similar misstatements.

The informant was asked to prepare tax returns showing wholesale and retail income for Nathan's Deli to submit to the insurance company. After doing so, Nathan then asked that separate tax returns be prepared that excluded wholesale figures, and he told her that the tax liabilities shown on returns submitted to the insurance company were much higher than he was willing to pay. At which point, the informant contacted the IRS.

The Internal Revenue Service Special Agent corroborated the statements. At that time, Nathan's 1991 and 1992 individual tax returns, along with the 1992 corporate tax return for Nathan's Deli, Inc., had not been filed. A copy of the 1991 corporate return for Nathan's Deli agreed with the return originally filed with the IRS. The income sheets showed additional wholesale business income that Nathan claimed the business made in 1991 and 1992 and the total figures corresponded to the tax returns that the informant prepared for submission to the insurance and mortgage companies. In addition, the IRS had issued tax delinquency notices to Nathan.

In taped telephone conversations, Nathan was explicit in stating he did not want wholesale income figures in tax returns prepared for the Internal Revenue Service. Bernstein also said that the returns to be filed with the IRS should permit them to obtain refunds. Nathan did not mind if the informant/practitioner did not sign the return as the preparer; and Bernstein advised the informant that she should not worry about asking them anything and further explained that she and Nathan felt comfortable with her or else would not be filing false returns.

In a later recorded conversation with Nathan and Bernstein, the informant gave Nathan the tax returns he requested she prepare for the IRS. She also showed Nathan and Bernstein copies of the 1991 and 1992

corporate tax returns she had earlier prepared, at his request, for insurance purposes. She then explained that the only difference between the returns was that the returns used for insurance purposes included wholesale and retail income and the returns to be used for tax reporting purposes included only retail income. Nathan reviewed the returns and told the informant that he wanted the returns with the lower tax liability to be filed with IRS, which occurred on February 8, 1994.

The Internal Revenue Service determined that there was probable cause that Nathan had filed false individual and corporate income tax returns with the IRS. Special Agent Brantley prepared affidavits in support of search warrants for records believed to exist at Nathan's Deli, Inc. and the residence and Harvey Nathan and Lynn Bernstein. On March 22, 1994, search warrants and affidavits were presented to and signed by U.S. Magistrate Judge Robert S. Carr for searches of Nathan's Deli, Inc. located at 1836 Ashley River Road, Charleston, South Carolina and the residence and garage of Harvey Nathan and Lynn Bernstein located at 14 Trail Hollow Drive, Charleston, South Carolina.

■ Based on the foregoing, there was probable cause. Plaintiffs complain that the Internal Revenue Service should have thoroughly investigated the history of the informant before proceeding with the investigating. Even if the allegations that the informant was unreliable were true, the Fourth Circuit has clearly held that it is not appropriate to substitute 20/20 hindsight for the judgment of law enforcement officers who are not alleged to have acted in bad faith. *Torchinsky v. Siwinski,* 942 F.2d 257 (4th Cir.1991). Investigators are not obligated to engage in the most exhaustive investigation imaginable, nor are they required to disclose all of the voluminous and possibly exculpatory information known to them in a warrant application. "[A] police officer's failure to pursue potential exculpatory evidence [is] not in itself sufficient to negate probable cause." *Id.* at 264. Accordingly, an allegation that the investi-

gators "knew or should have known" some fact cannot support a *Bivens* claim.

With valid and properly obtained search warrants, the conduct of the agents in performing the search did not broach any clearly established constitutional rights. Special Agents Ruark, Wilder, Cox and Freeland performed the search of the residence. The agents were at the residence for nearly half an hour before entering, all the while knocking on the door, ringing the doorbell, announcing their presence. When the agents announced their presence upon entry and searched the vacant rooms, there was no violation. Nathan had no constitutional right to communicate with Bernstein, nor did she have any right to be alerted of the search.

Getting to the crux of the allegations, there was no violation by the special agents entering the downstairs bedroom. The special agents merely performed a protective sweep of the residence to ensure their safety prior to beginning the search, including entry into the downstairs bedroom through a closed door. In this circumstance, a protective sweep incident to a search warrant, there is no constitutional right to not have a federal officer point his weapon and demand that a person not move after entering a residential room through a closed door. Assuming the allegations are true, there is no clear violation of a constitutional right and therefore, the allegations fail to even satisfy the heightened pleading requirements in this Circuit. See *Dunbar Corp. v. Lindsey,* 905 F.2d 754, 764 (4th Cir.1990); *Awalt v. Whalen,* 809 F.Supp. 414, 416 (E.D.Va.1992).

A *Bivens* claim would perhaps be cognizable, if hypothetically, the agents had their weapons pointed at Bernstein for an unreasonable period of time, *i.e.,* thirty minutes, and for no legitimate reason, *i.e.,* after the residence was otherwise secure. With respect to the conduct of the searches, the complaint fails to reveal any transgressions that clearly violate well-established constitutional rights. *Baker v. McCollan,* 443 U.S. 137, 145–146, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (not all invasions of personal rights rise to the level of constitutional violations); *Bell v. School Board of City of Norfolk,* 734 F.2d 155, 157 (4th Cir.1984). Accordingly,

the actions against the federal agents in their personal capacities should be dismissed.

 *Qualified Immunity.* Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 110 F.3d 1071, 1075 (4th Cir.1997), *citing Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Winfield v. Bass,* 106 F.3d 525, 530 (4th Cir.1997) (en banc). The constitutional right must be so well established that any reasonable law enforcement officer would have recognized that the actions were wrong. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The only circumstance under which one of the federal agents could be held liable is "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley,* 475 U.S. at 344.

In the Fourth Circuit, the determination of a defense of qualified immunity involves three distinct steps:

(1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the officer's position would have known that doing what he did would violate that right.

*Wilson,* 110 F.3d at 1073; *Simmons v. Poe,* 47 F.3d 1370, 1385 (4th Cir.1995).

 In this circuit, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Wilson v. Layne,* 110 F.3d 1071, 1075 (4th Cir. 1997), *citing Malley v. Briggs, supra.* It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only for "transgressing bright lines." *Id. citing Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.1992).

The Fourth Circuit has stated that the "test of the objective reasonableness of official action has been formulated with the express purpose of according police officers latitude in exercising what are inescapably discretionary functions replete with close judgment calls." *Gooden v. Howard County,* 954 F.2d 960, 964 (4th Cir.1992) (citing *Harlow* ) ("where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences' "). The Fourth Circuit also added that "[t]he immunity is to be applied with due respect for the perspective of police officers on the scene and not with the greater leisure and acquired wisdom of judicial hindsight." *Gooden,* 954 F.2d at 964. Consistently, other circuits have held that the conduct must be "grossly disproportionate to the need for action under the circumstances," *Hinojosa v. City of Terrell,* 834 F.2d 1223, 1230 (5th Cir.1988) (pointing of gun fails to violate constitutional right), or have described the standard as "whether the use of force was so egregious as to be constitutionally excessive." *Gumz v. Morrissette,* 772 F.2d 1395, 1401 (7th Cir.1985).

 Assuming a claim is properly stated, all defendant agents are entitled to qualified immunity without even considering the additional circumstances at the residence. In *McElroy v. United States,* 861 F.Supp. 585 (W.D.Tex.1994), while executing a "no knock" search warrant, police officers broke into the wrong house with a battering ram, tackled and pinned the plaintiff to the floor which caused cuts and bruises, grabbed his hair, held a gun to his head, handcuffed him, and then questioned him for forty-five minutes before releasing him. In considering whether the police officer who pointed the gun while executing a search warrant was entitled to qualified immunity, the court reasoned as follows:

It is important to recognize that the exigency of the circumstances forced the officers to act purely on instinct; they did not have the luxury of quiet contemplation afforded by the chambers of this courthouse. The instant they crashed through the door,

440

they came face to face with McElroy and saw Griesbach standing near the stairs approximately twenty feet away. They had little time to stop, collect their thoughts, and assess whether McElroy or Griesbach posed a threat to their safety. The only significant physical harm suffered by the Plaintiffs was McElroy's loss of hair and cut on Griesbach's left shin. While the officers undoubtedly intended to tackle McElroy and Griesbach, they did not intend to inflict these injuries upon them. After determining McElroy and Griesbach posed no threat to their safety, the officers did nothing further to physically harm them. Additionally, the officers were justified in pointing a gun at McElroy and Griesbach until they could place them in handcuffs. *See Hinojosa v. City of Terrell,* 834 F.2d 1223, 1231 (5th Cir.1988), *cert. denied* 493 U.S. 822, 110 S.Ct. 80, 107 L.Ed.2d 46 (1989) (finding that no Texas law "circumscribes a police officer's ability, in the course of duty, to make a conditional threat to use force if necessary by pointing a gun at someone.").

The court in *McElroy* concluded that the officers did not act beyond the discretion afforded the law enforcement agents under such circumstances.

In *Beideman v. Internal Revenue Service,* 72 A.F.T.R.2D 93–6188, 1993 WL 542350 (D.Del.1993), the court held that the drawing of weapons by IRS agent during the execution of a search does not violate the Fourth Amendment. See also *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (protective sweep reasonable without a warrant if articulable facts along with rational inferences warrant reasonably prudent officer).

Finally, when the circumstances at the residence are considered, beyond those alleged, the entitlement to qualified immunity is even more apparent. Given what had transpired between 7:00 a.m., when the agents arrived at the residence, and 7:25 a.m., the time they entered the residence, the agents had additional reason to be cautious. First, the agents had been informed that Bernstein was supposedly in the residence. Second, for some inexplicable reason, Bernstein had apparently not been awakened by 7:25 a.m. despite twenty-five minutes of nearly continuous knocking on the front door, ringing the doorbell, announcements by the agents of their presence, and a dog barking continuously on the back porch of the residence. At this point, it would seem rather unusual to any officer that a response was not received if someone was inside the residence.

This was followed by entry into the residence by the agents and more announcements without any response whatsoever. At this point, the agents certainly had good reason to be cautious in proceeding through a closed door. Agents Ruark and Wilder knocked, announced, waited less than twenty seconds, and entered the room with weapons drawn to find Bernstein sitting up in bed, her hands under the covers, with an unidentified object hidden under the covers near her hands. Unsurprisingly, the two agents instructed her to raise her hands, to which Bernstein reluctantly did, but Bernstein then lowered her hands several times toward the bed covers.[3] In response, the agents told her several more times to raise her hands.[4] The agents verbally identified themselves and were wearing official law enforcement raid gear. Special Agent Wilder pulled back the bed covers and identified the object near Bernstein's hands as a mobile telephone. The entire sequence within which the weapons were drawn, from the entry into the room until the phone was identified, was less than a minute.[5]

3. The agents' declarations state that their weapons were raised, in a ready position, pointed down, but in the direction of Bernstein. Bernstein alleges the weapons were pointed directly at her. The discrepancy is irrelevant for purposes here because her allegation, even if true, fails to state or claim or the agents have qualified immunity.

4. Bernstein alleges she was hysterical; the agents' declarations state that she was neither alarmed or hysterical from their entry; even if her statement is true, her reaction is irrelevant to the issue of the agents' conduct.

5. Bernstein alleges she repeatedly asked the agents to put down their weapons and that the agents refused to let her change out of her nightclothes. Even if true, until the object in the

Next, Special Agent Wilder asked Bernstein if she wanted a housecoat and after Bernstein approved, Wilder retrieved and gave Bernstein a housecoat. The agents inquired as to the presence of weapons and valuables. There were valuables in a jewelry box, which was located, inspected and then given to Bernstein. Bernstein was then escorted to the living room. The total time in the bedroom was less than ten minutes. The agents then completed the search and then departed the residence at approximately 9:30 a.m., thus completing the search of the residence in approximately two hours.[6]

 Nathan's allegations of the search at Nathan's Deli business site is devoid of any conduct that even approaches a constitutional violation. There is no constitutional right to have an investigative agency conduct a criminal search after business hours or at a more convenient time. Nevertheless, the search was completed at the business site in four hours. The fact that the customers were requested to leave and that the site was temporarily closed do not pose constitutional issues.[7] Nathan also complains that the Internal Revenue Service retained records for an unreasonable length of time.[8] Nathan apparently never filed a motion for return of property under the federal criminal rules in the search warrant matter, which would have been the appropriate way to proceed. Regardless, while Nathan may have been entitled to the original records or copies of the records while the investigation was ongoing, the retention by the Service for a criminal investigation is not a constitutional violation. Furthermore, according to the lead investigating agent, no requests were ever made by Nathan or Bernstein for the return of rec-

ords needed for the ongoing activities of their business.

 The complaints make general allegations regarding the "unreasonable" time period that each were detained. As discussed, such general allegations fail to state a *Bivens* claim in this Circuit. To repeat, the searches were concluded at 9:30 and 11 a.m., respectively. Furthermore, the IRS defendants also had the limited authority to detain the occupants at the premises while conducting the search of the premises. See *Michigan v, Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Thus, plaintiffs failed to state a constitutional violation. Irrespective, the agents participating in the search of the business site are entitled to qualified immunity based on the cases cited above. Although not directly pertinent to the issue here, Nathan did engage in criminal conduct by submitting false income tax returns to an insurance company, he was indicted, and he pled guilty to one count of wire fraud.

 Defendants do not intend to trivialize the intrusion that inevitably accompanies a search pursuant to a warrant on property controlled by the subjects of an investigation. As the Fourth Circuit wrote in *Torchinsky:*

> We do not minimize the misfortune that occurred here—misfortune that undoubtedly occasioned disruption and distress in the lives of these plaintiffs ..., but not every unfortunate incident gives rise to ... liability.... The police must be held to standards of reasonableness, not to standards of perfection. A society that expects police officers to provide protection must

---

bed was identified as a phone and the agents considered the room to be otherwise secure, the display of weapons do not reach the level of a constitutional violation.

6. Plaintiffs seem to allege that they were also addressed in a loud or threatening manner by the defendants. But even the most abusive verbal attacks do not violate the Constitution. *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir. 1987); *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir.1979); *Martin v. Sargent,* 780 F.2d 1334, 1338 (8th Cir.1985); *McFadden v. Lucas,* 713 F.2d 143, 146 (5th Cir.), *cert. denied,* 464 U.S. 998, 104 S.Ct. 499, 78 L.Ed.2d 691 (1983).

7. To the extent Nathan claims some sort of damage to the reputations of the business because of the search, this fails to state a claim under *Bivens. Paul v. Davis,* 424 U.S. 693, 711–712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

8. Plaintiff asserts generally that "records" were necessary for conducting business, but fails to specify any particular records. Moreover, the investigation concerned accounting records from 1991 and 1992. The search was conducted in April 1994. The supposed necessity of old accounting records to the current business operations is questionable at best.

afford them in turn some protection from lawsuits. *Torchinsky,* 942 F.2d at 264. Law enforcement officers, who never know how people will react when they attempt to execute their warrant, are entitled to secure the premises and ensure their safety and the safety of others. *Cf. Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (recognizing the need for the "protection of the police officer and others nearby"); *Torchinsky,* 942 F.2d at 263 ("Criminal investigations are often conducted under trying conditions over which officers have limited control"). Once that is done, they are entitled to execute the search and to seize the materials described in the warrant. That is all the federal agents did.

 Even if these cases could be considered in the context of the appropriate use of force, which is extremely doubtful, the use of force by a state officer is unconstitutional if it 1) caused severe injuries, 2) was grossly disproportionate to the need for action under the circumstances, and 3) was inspired by malice rather than careless or immature overzealousness so that it amounted to an abuse of official power that shocks the conscience. See *Wise v. Bravo,* 666 F.2d 1328, 1333 (10th Cir.1981); *Hall v. Tawney,* 621 F.2d at 613 (4th Cir.). It is quite apparent that plaintiffs cannot allege claims in this arena.

■ *Personal Jurisdiction.* Plaintiffs failed to properly effect service of the complaints on defendant Ruark. (Ruark Decl., para. 17) As a result, personal jurisdiction was not established over Ruark and the actions against him should be properly dismissed pursuant to Fed.R.Civ.P. 12(b)(5). *Peters v. United States,* 9 F.3d 344, 345–46 (5th Cir.1993); *George v. United States Dep't of Labor,* 788 F.2d 1115, 1116 (5th Cir.1986) *See Royal Lace Paper Works v. Pest–Guard Products, Inc.,* 240 F.2d 814, 816 (5th Cir. 1957); *Despain v. Salt Lake Area Metro Gang Unit,* 13 F.3d 1436, 1438 (10th Cir. 1994); *Hutchinson v. United States,* 677 F.2d 1322, 1327–28 (9th Cir.1982); *Micklus v. Carlson,* 632 F.2d 227, 240 (3d Cir.1980); *Deutsch v. U.S. Department of Justice,* 881 F.Supp. 49, 52 (D.D.C.1995).

For the foregoing reasons, the Court grants the defendants' motions and dismisses the actions. In the event any claims were properly stated against the officers in their personal capacities, the Court grants summary judgment to the federal agent defendants on qualified immunity grounds.