

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-17-2001

# Leveto v. Lapina

Precedential or Non-Precedential:

Docket 00-3241

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Leveto v. Lapina" (2001). *2001 Decisions.* Paper 155.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/155

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 17, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3241

DANIEL J. LEVETO; MARGARET A. LEVETO,

      Appellants

v.

ROBERT A. LAPINA; RICHARD W. ADAMS; JUDY A.
GRAHAM; SUZI HINES; THOMAS DEMKO; GEORGE
TORBIC; JOHN WATSON; DAVID KIRK; DEBORAH KIRK;
ROBERT GROOVER; JEFF MILLER; EDWARD WIR TH;
CYNTHIA UNDERWOOD; ELIZABETH QUINN;
"JOE RIVERA"

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(Dist. Court No. 98-143)
District Court Judge: Maurice B. Cohill, Jr.

Argued on October 26, 2000

Before: MANSMANN, ALITO, and FUENTES,
Circuit Judges.

(Opinion Filed: July 17, 2001)

        WILLIAM G. McCONNELL (Argued)
        Ekker, Kuster & McConnell
        P.O. Box 91
        Sharon, PA 16146

        Counsel for Appellants

JONATHAN S. COHEN
A. WRAY MUOIO (Argued)

Tax Division
United States Department of Justice
P.O. Box 502
Washington, DC 20044

Counsel for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

Dr. Daniel Leveto and his wife, Margaret Leveto, filed this action against numerous known and unknown Internal

Revenue Service ("IRS") agents. The Levetos asserted numerous federal constitutional claims under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), as well as many federal statutory claims. All of the claims arose from an IRS investigation of the Levetos and the execution of search warrants at the Levetos' home and Dr. Leveto's veterinary office. The

District Court dismissed the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and the Levetos took this appeal.

Most of the arguments raised on appeal lack merit and do not require further discussion. However, some of the

Levetos' Fourth Amendment claims present important issues concerning the execution of search warrants. The Levetos allege that the IRS agents, in executing the warrants, improperly patted them down, detained them for up to eight hours without probable cause or reasonable suspicion, and closed Dr. Leveto's business. We hold that the Levetos successfully alleged certain violations of their Fourth Amendment rights, but we conclude that the defendants were entitled to qualified immunity due to uncertainty in the case law, and we therefore affirm the

decision of the District Court.

I.

A.

The following facts are alleged in the Second Amended Complaint ("the Complaint"). On May 2, 1996, as part of an investigation into Dr. Leveto's tax-r elated activities, 15 IRS agents executed search warrants at the Levetos' home and the Langdon and Leveto Veterinary Hospital, where Dr. Leveto worked as a veterinarian and general manager . See Complaint PP 20-21, 23-24, 31. According to the Complaint, Dr. Leveto arrived at the hospital that day at approximately 6:30 a.m. and was rushed in the parking lot by armed agents. Id. P 20. Some agents informed Dr. Leveto that they had a search warrant, flashed the warrant in front of him, and patted him down, while other agents shouted, "Where are the weapons?" Id. P 21. The agents escorted Dr. Leveto into the hospital, wher e he was held in a small room for roughly one hour and was prohibited from answering the phone or speaking with anyone other than the agents. Id. P 22.

After an hour, the agents ordered Dr. Leveto to accompany them to a location where they met other agents, and they then proceeded to the Levetos' home. Id. P 23. At the Levetos' home, the agents again displayed a sear ch warrant and patted down Margaret Leveto, who was wearing only a nightgown. Id. Several agents remained at the Levetos' home, where they detained Mrs. Leveto for approximately six hours, interrogated her without providing Miranda warnings, and conducted a sear ch in which they seized thousands of documents, including family medical records, personal mail, and most of the publications in the Levetos' personal library. Id. PP 24, 106-07, 120, 138.

Other agents ordered Dr. Leveto to return with them to the hospital, where they held him in a closed r oom for approximately six hours. Id. PP 25, 141. He was not permitted external communication and was supervised during visits to the restroom. Id. During this six-hour seizure, armed agents interrogated Dr. Leveto without providing Miranda warnings, while other agents searched the hospital. Id. PP 26-27, 137, 141, 145.

During the course of the search, the IRS agents sent hospital employees home and turned away clients in the parking lot, informing them that the hospital was closed until further notice. Id. PP 29-30. The agents likewise prevented Dr. Leveto from speaking with clients or fellow employees or otherwise performing his duties as general manager. Id. PP 31-32, 145.

When the search of the hospital concluded, the agents took away thousands of documents containing r ecords of five companies, confidential medical and financial information on clients, and computer softwar e. Id. PP 33-34. No weapons were located on the premises. Id. P 36.

B.

The named defendants moved to dismiss the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and they contended that they were entitled to qualified immunity on the federal constitutional claims. The District Court granted this motion. Holding that the pat downs did not violate the Levetos' Fourth Amendment rights, the Court quoted with approval another district court opinion stating that " `the courts have permitted police officers to frisk all occupants of premises being searched without r egard to any particularized suspicion that the officer may have' " and that this authority permits the frisking of"even those persons who happen to be scantily clad at the time of the search." App. 41 (quoting Collier v. Locicero, 820 F. Supp. 673, 681 (D. Conn. 1993)). With respect to the detention of the Levetos, the District Court relied on Michigan v. Summers, 452 U.S. 692 (1981), and stated that"during execution of a search warrant, police can detain the occupant of the premises they have a warrant to search." App. 41. In addition, the Court held that "no r easonable officer in the defendants' position would have believed that their conduct violated clearly established constitutional rights." Id. at 42. This appeal followed.

4

II.

A.

Our review of both a dismissal under Fed. R. Civ. P. 12(b)(6) and a grant of qualified immunity is plenary. Board of Trustees of Bricklayers & Allied Craftsmen Local 6 of New Jersey Welfare Fund v. Wettlin Assocs., Inc., 237 F.3d 270, 272 (3d Cir. 2001); Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999). In reviewing the dismissal of a claim under Rule 12(b)(6), we must "accept the allegations of the complaint as true and draw all reasonable inferences in the light most favorable to the plaintiff[s]." Board of T rustees, 237 F.3d at 272. Dismissal is proper "only if it is clear that no r elief could be granted under any set of facts that could be proved consistent with the allegations." Brown v. Philip Morris Inc., 2001 WL 533654, *3 (3d Cir. 2001).

This same approach must be followed when qualified immunity is asserted in a Rule 12(b)(6) motion. Although immunity is an affirmative defense, "a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense . . . appears on its face." ALA, Inc. v. CCAir, Inc., 29 F.3d 855, 859 (3d Cir. 1994); see also 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure S 1357, at 358-59 (1990) (citing cases). Thus, qualified immunity " `will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint.' " Hafley v. Lohman, 90 F .3d 264, 266 (8th Cir. 1996) (citation omitted); see also, e.g. , Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998) (official immunity); Santamorena v. Georgia Military College, 147 F.3d 1337, 1340 (11th Cir. 1998).

B.

The principles governing claims of qualified immunity are well-established. Under this doctrine, "gover nment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

5

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also
Torres v. United States, 200 F .3d 179, 184 (3d Cir. 1999);
Grant v. City of Pittsburgh, 98 F.3d 116, 121 (3d Cir. 1996);
Shea v. Smith, 966 F.2d 127, 130 (3d Cir . 1992). The
doctrine of qualified immunity "provides ample protection to
all but the plainly incompetent or those who knowingly
violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986);
see also Giuffre v. Bissell, 31 F .3d 1241, 1255 (3d Cir.
1994).

In determining whether qualified immunity applies in a
specific case, we "first determine whether the plaintiff has
alleged the deprivation of an actual constitutional right at
all." Wilson v. Layne, 526 U.S. 603, 609 (1999) (quoting
Conn v. Gabbert, 526 U.S. 286, 290 (1999)); see also Assaf
v. Fields, 178 F.3d 170, 174 (3d Cir . 1999); Siegert v. Gilley,
500 U.S. 226, 232 (1991) ("A necessary concomitant to the
determination of whether the constitutional right asserted
by a plaintiff is `clearly established' at the time the
defendant acted is the determination of whether the
plaintiff has asserted a violation of a constitutional right at
all."); Torres, 200 F .3d at 184 ("A court . . . need not
consider whether the right implicated was clearly
established . . . if the plaintiff has not alleged a deprivation
of a constitutional right."); Giuffre, 31 F.3d at 1247, 1255.1
"[I]f so, [we] proceed to deter mine whether that right was
clearly established at the time of the alleged violation."
Wilson, 526 U.S. at 609 (quoting Conn , 526 U.S. at 290);
see Assaf, 178 F.3d at 174.

A right may be clearly established even if ther e is no
"previous precedent directly in point." Good v. Dauphin
County Soc. Servs. for Children & Youth, 891 F.2d 1087,
1092 (3d Cir. 1989); see also Assaf, 178 F.3d at 177. "The
ultimate issue is whether . . . reasonable officials in the
defendants' position at the relevant time could have

_____

1. We have said, however, that"[w]here appropriate, we may consider
whether the constitutional rights asserted . . . wer e `clearly
established'
at the time the individual officials acted, without initially deciding
whether a constitutional violation was alleged at all." Giuffre, 31 F.3d
at
1255; see also Acierno v. Cloutier, 40 F.3d 597, 607 n.7 (3d Cir. 1994)(en
banc).

6

believed, in light of what was in the decided case law, that their conduct would be lawful." Good, 891 F.2d at 1092; see also Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("[I]n the light of pre-existing law the unlawfulness must be apparent"; otherwise qualified immunity is available.); Assaf, 178 F.3d at 177 (quoting Anderson, 483 U.S. at 640); Giuffre, 31 F.3d at 1255 (quoting Good, 891 F.2d at 1092); Shea, 966 F.2d at 130 (" `Clearly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

If a reasonable official would have known that the conduct was unlawful, qualified immunity is generally not available.[2] See Harlow, 457 U.S. at 818-19 ("If the law was clearly established, the immunity defense or dinarily should fail, since a reasonably competent public official should know the law governing his conduct."); Assaf, 178 F.3d at 181 (Where "[a]ny hypothetical r easonable official should have known that" a state employee's position was protected by the First Amendment, qualified immunity was not available.); Shea, 966 F.2d at 130 (citing Harlow, 457 U.S. at 818). If, on the other hand, the law was not clearly established or a reasonable official could have believed the actions to be lawful, the official is entitled to immunity. See Harlow, 457 U.S. at 818; Karnes v. Skrutski, 62 F.3d 485, 492, 493-94 (3d Cir. 1995); Giuffr e, 31 F.3d at 1256-57; Shea, 966 F.2d at 130; Good, 891 F.2d at 1092.

In this case, we must decide whether, "accept[ing] the allegations of the complaint as true and draw[ing] all reasonable inferences in the light most favorable to the plaintiff[s]," Board of T rustees, 237 F.3d at 272, "a reasonable [agent] could have believed[the IRS agents' actions in conducting the search] to be lawful, in light of clearly established law and the information the searching

_____

2. "[I]f the official pleading the [qualified immunity] defense claims extraordinary circumstances and can pr ove that he neither knew nor should have known of the relevant legal standar d, the defense should be sustained." Harlow, 457 U.S. at 819. No extraordinary circumstances appear on the face of plaintiffs' Complaint, nor have defendants sought to fit within this exception.

7

[agents] possessed." Anderson, 483 U.S. at 641; see also Wilson, 526 U.S. at 615; Torr es, 200 F.3d at 184.

III.

A.

Dr. and Mrs. Leveto complain that the IRS agents violated the Fourth Amendment in patting them down during the execution of the search warrants. As noted, the agents allegedly patted down Dr. Leveto in the hospital parking lot as he arrived for work. The agents patted down Mrs. Leveto at her home.

A pat down is unquestionably a search cover ed by the Fourth Amendment. As the Supreme Court held in Terry v. Ohio, 392 U.S. 1 (1968), "it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a `search.' " Id. at 16. Indeed, a pat down can be "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong r esentment." Id. at 17; see also Complaint PP 166, 174.

As with other searches, the constitutionality of a pat down is judged by a standard of reasonableness. See Terry, 392 U.S. at 19-22; see also Illinois v. McArthur , 531 U.S. ___, ___, 121 S. Ct. 946, 949 (2001) (The Fourth Amendment's " `central requirement' is one of reasonableness."); Maryland v. Buie, 494 U.S. 325, 331 (1990) ("[T]he Fourth Amendment bars only unr easonable searches and seizures."); United States v. Sharpe, 470 U.S. 675, 685 (1985) ("The Fourth Amendment is not, of course, a guarantee against all searches and seizures, but only against unreasonable searches and seizures."); Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977) (per curiam) ("The touchstone of our analysis under the Fourth Amendment is always `the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' "). Reasonableness is determined "by balancing the need to sear ch [or seize] against the invasion which the search [or seizure] entails."

8

Terry, 392 U.S. at 21 (quoting Camara v. Municipal Court, 387 U.S. 523, 537 (1967)); see also McArthur, 531 U.S. at ___, 121 S. Ct. at 950 ("[R]ather than employing a per se rule of unreasonableness [in this case], we balance the privacy-related and law enforcement-r elated concerns to determine if the intrusion was reasonable."); Buie, 494 U.S. at 331; Mimms, 434 U.S. at 109.

Based on this balancing, the Supreme Court has held that an officer may conduct "a reasonable search for weapons for the protection of the . . . officer, where [the officer] has reason to believe that he is dealing with an armed and dangerous individual, r egardless of whether he has probable cause to arrest the individual." Terry, 392 U.S. at 27; see also Michigan v. Long, 463 U.S. 1032, 1034 (1983) (pat down allowed when officer "possesses an articulable suspicion that an individual is ar med and dangerous"); Ybarra v. Illinois, 444 U.S. 85, 92-93 (1979) ("[A] reasonable belief that [a person] was armed and presently dangerous . . . must for m the predicate to a patdown of a person for weapons."); United States v. Kithcart, 218 F.3d 213, 219 (3d Cir . 2000) (recognizing "that a police officer may conduct a reasonable search for weapons for his or her own protection without violating the Fourth Amendment `where he[/she] has r eason to believe that he[/she] is dealing with an armed and dangerous individual"); United States v. Kikumura, 918 F.2d 1084, 1092 (3d Cir. 1990) ("A police officer may search a detained individual for weapons if he has reasonable suspicion that the individual could be armed and danger ous to the officer or others."); United States v. Patterson, 885 F.2d 483, 485 (8th Cir. 1989) (security frisk upheld wher e officer "was armed with sufficient facts to be concer ned about his safety and that of his fellow officers"); United States v. Corona, 661 F.2d 805, 807 & n.2 (9th Cir. 1981) (officer must "have a founded suspicion, based upon articulable facts, that [the suspect] was armed and presently dangerous"); United States v. Clay, 640 F.2d 157, 159, 161-62 (8th Cir. 1981) ("Protective searches are authorized only when the police officer has suspicion that the individual befor e him may be armed or otherwise presently danger ous."); United States v. Cole, 628 F.2d 897, 899 (5th Cir. 1980) (Terry requires "that specific articulable facts support an inference that the

9

suspect might be armed and dangerous."). Thus, conducting a pat down is lawful when, under the circumstances, an officer has a reasonable belief that the subject is armed and dangerous.

To justify a pat down, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21; see also id. at 21 n.18 (The "demand for specificity in the information upon which police action is predicated is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence."); Buie, 494 U.S. at 332; Kithcart, 218 F.3d at 219; Kikumura, 918 F.2d at 1092 ("[O]fficer, at the time of the search, must know of `specific and articulable facts . . . .' "). The court must then deter mine whether "the facts available to the officer at the moment of . . . the search `warrant a man of reasonable caution in the belief ' that the action taken was appropriate." T erry, 392 U.S. at 21–22; see also Kithcart, 218 F.3d at 219.

The Supreme Court has also held that possession of a warrant to search particular premises is not alone sufficient to justify a pat down of a person found on the pr emises at the time of execution. In Ybarra v. Illinois, 444 U.S. at 94, the Court held that Terry "does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized . . . search is taking place." See also Clay , 640 F.2d at 160–62; Cole, 628 F.2d at 899. Thus, even though the police in Ybarra had a warrant to search the taver n in question, the police were not justified in patting down Ybarra merely because he was on the premises at the time of execution. See Ybarra, 444 U.S. at 91–94; see also Clay , 640 F.2d at 158, 160–62 (pat down of unknown visitor who arrived during execution of warrant not justified); Cole, 628 F.2d at 898–99 (pat down of individual who pulled into carport as police arrived to execute warrant at residence not justified).

B.

In view of the above authorities, we hold that the Complaint alleges a valid Fourth Amendment violation

10

regarding the pat down of Mrs. Leveto. In order to pat her down, the agents needed a reasonable suspicion that she was armed and dangerous, and under Ybarra her presence on the premises was not alone sufficient to justify the pat down. We recognize that Mrs. Leveto, unlike Ybarra, was a resident of the premises being sear ched and may have been a subject of the criminal investigation. These ar e factors that must be considered in determining whether the agents had reasonable suspicion that Mrs. Leveto was armed and dangerous. See Summers, 452 U.S. at 695 n.4; cf. United States v. Barlin, 686 F.2d 81, 87 (2d Cir . 1982) (distinguishing Ybarra, who was "innocuously pr esent in a crowd at a public place," from woman who entered apartment evidently used for narcotics trafficking with individuals apparently involved in an ongoing narcotics deal). However, we do not believe that these factors alone are enough to provide a reasonable suspicion, and the Complaint alleges no other facts about Mrs. Leveto's background, her prior activities, or the natur e of the crimes under investigation that provided reasonable suspicion that she presented a danger to the agents.

In assessing whether law enforcement officers are justified in taking precautions for their own protection, "[w]e must . . . keep in mind that a thr eat that may seem insignificant to us in the security of our chambers may appear more substantial to a reasonable officer whose own life or safety is at stake," Mellott v. Heemer, 161 F.3d 117, 122 (3d Cir. 1998), but at the same time we cannot endorse a blanket rule that law enforcement officers may always pat down any resident who is present in pr emises being searched and who may be a subject of the investigation, no matter what the nature of the suspected of fense. We thus conclude that, if the allegations in the Complaint concerning the pat down of Mrs. Leveto ar e viewed in the light most favorable to the plaintiffs, Mrs. Leveto's Fourth Amendment rights were violated.

We reach a similar conclusion concer ning the constitutionality of the pat down of Dr. Leveto. The Complaint identifies no reason to suspect that Dr. Leveto was armed or that he even owned any fir earms.3 The

_____

3.  Indeed, Dr. Leveto alleges that he is dedicated to animal welfare and that he and his family oppose hunting. ComplaintP 36.

investigation into possible tax evasion, without mor e, provided little reason to suspect that he posed a threat. Moreover, at the time of the pat down, Dr. Leveto was not in a building or room being searched but in the parking lot. We cannot assume that he would have enter ed the veterinary hospital or even approached the officers if they had not rushed his car and patted him down. Accor dingly, the plaintiffs have alleged a claim for unr easonable search based on the pat down of Dr. Leveto.

C.

Although we conclude that the Complaint asserts valid Fourth Amendment claims regarding the pat downs of Mrs. Leveto and Dr. Leveto, we also hold that the agents were entitled to qualified immunity with respect to these claims. While we now reject the proposition that law enforcement officers may always pat down a resident who is found in premises being searched and who is a possible subject of the investigation, this was not clearly established when these warrants were executed. Indeed, ther e was at least some significant authority to the contrary. For example, in Rivera v. United States, 928 F.2d 592, 606 (2d Cir. 1991), which the District Court cited, the Second Cir cuit wrote that the police "have the authority to make a limited search of an individual on [premises being sear ched] as a self-protective measure." As a leading tr eatise states, some of the lower court cases decided after Ybarra "indicate[d] a willingness to allow a frisk provided the person ha[d] a somewhat stronger link to the premises than Ybarra did to the bar where he was found." 2 Wayne R. LaFave, Search and Seizure S 4.9(d), at 641 (3d ed. 1996);4 see United States v. Reid, 997 F.2d 1576 (D.C. Cir . 1993) (person departing apartment to be searched for drugs); United States v. Harvey, 897 F.2d 1300 (5th Cir . 1990) (person who drove to location where search had discovered drugs);

_____

4. This treatise also viewed the Supr eme Court's decision in Michigan v. Summers, 452 U.S. 692 (1981), as expressing "greater concern about the dangers attending execution of a search warrant where private premises are involved and persons connected with the pr emises are present." 2 LaFave, supra, S 4.9(d), at 642 n.76.

United States v. Patterson, 885 F.2d 483 (8th Cir. 1989) (person who arrived at scene of drug search driving resident's vehicle). In view of these authorities, we hold that a reasonable agent could have believed that patting down Mrs. Leveto and Dr. Leveto was permitted by the Fourth Amendment. We therefore hold that the defendants in this case are entitled to qualified immunity with respect to the Fourth Amendment pat down claims.

IV.

A.

We now consider the plaintiffs' argument that they were seized in violation of the Fourth Amendment during the lengthy process of executing the search warrants at the veterinary hospital and the Levetos' residence. A seizure within the meaning of the Fourth Amendment occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." Terry, 392 U.S. at 16; see also id. at 19 n.16 ("[W]hen [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . we[may] conclude that a `seizure' has occurred."); Summers, 452 U.S. at 696 (Detention of homeowner was a seizure where he "was not free to leave the premises while the officers were searching his home."); Clay, 640 F.2d at 159 (Restriction of freedom to leave "by physical restraint or by sufficient show of authority" effects a seizure.).

Here, it is plain that both Dr. Leveto and Mrs. Leveto were seized. As previously noted, according to the Complaint, Dr. Leveto's freedom was restrained from the time of the initial pat down in the parking lot through the forced relocation and armed detention that persisted until the completion of the search some eight hours later. See Complaint PP 20-33. During this time, Dr. Leveto's freedom of movement was restricted, and he was even prevented from speaking with others or using a restroom without a chaperone. Dr. Leveto was thus subjected to an extended "seizure" within the meaning of the Fourth Amendment. Similarly, Mrs. Leveto was "seized" when she was detained during the six-hour search of her home.

13

As "the central inquiry under the Fourth Amendment . . . [is] the reasonableness in all the cir cumstances of the particular governmental invasion of a citizen's personal security," the Levetos' seizures can be upheld as constitutional only if they were reasonable. Terry, 392 U.S. at 19. "[T]he general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by pr obable cause." Summers, 452 U.S. at 700. However, an "exception [exists] for limited intrusions that may be justified by special law enforcement interests." Id. The reasonableness of these intrusions is determined by balancing the intrusiveness of the seizure against law enforcement inter ests and law enforcement's "articulable basis for suspecting criminal activity." See id. at 699–705 (employing balancing to arrive at general rule); see also Terry, 392 U.S. at 20–21, 27; Baker v. Monroe Township, 50 F .3d 1186, 1192 (3d Cir. 1995).

The Supreme Court has identified several law enforcement interests that, when balanced against the degree of intrusion, might justify a limited seizure pursuant to a search: namely, the "general inter est [in] . . . effective crime prevention and detection," T erry, 392 U.S. at 22; the "interest in preventing flight in the event that incriminating evidence is found"; "the interest in minimizing the risk of harm to the officers" and the occupants of the area searched, which is served "if the officers routinely exercise unquestioned command of the situation"; and the interest in "the orderly completion of the sear ch," which "may be facilitated if the occupants of the premises ar e present" to open secured doors or containers. Summers , 452 U.S. at 702–03; see also Baker, 50 F.3d at 1191; United States v. Edwards, 103 F.3d 90, 93 (10th Cir . 1996); United States v. Cochran, 939 F.2d 337, 339 (6th Cir . 1991); Daniel v. Taylor, 808 F.2d 1401, 1404 (11th Cir. 1986).5 In addition, the Supreme Court has found that "[i]f the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that" a sear ch of the home is

_____

5. A detention may be reasonable even if fewer than all of these law enforcement interests are present. See United States v. Bohannon, 225 F.3d 615, 617 (6th Cir. 2000).

14

justified, "[t]he connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." Summers, 452 U.S. at 703-05.

Whether these law enforcement interests can justify a seizure depends on the intrusiveness of the seizure. The Court's holdings in Michigan v. Summers and Dunaway v. New York, 442 U.S. 200 (1979), illustrate this principle.

In Michigan v. Summers, 452 U.S. at 693 & n.1, police officers found the owner of a home descending the front steps as they arrived to search for nar cotics pursuant to a warrant. The officers stopped and detained the homeowner while they executed the search, which located narcotics under a bar in the basement. Id. The Supr eme Court held that this detention "was `substantially less intrusive' than an arrest." Id. at 702 (quoting Dunaway, 442 U.S. at 210). The Court observed that the detention was only an incremental intrusion where there was already a warrant to conduct the more intrusive search of the home. Id. at 701, 703. Moreover, the Court noted that most people would prefer "to remain in order to observe the search of their possessions," and the Court added that "because the detention . . . was in [the detainee's] own r esidence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." Id. at 701, 702. Finally, the Court found that "the type of detention imposed . . . [was] not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the infor mation the officers [sought] normally [would] be obtained through the search and not through the detention." Id. at 701.

The Court found that the detention in Summers  was reasonable in view of the limited natur e of the intrusion, the law enforcement interests discussed above, and the individualized suspicion of criminal activity cr eated by the detainee's link to the home being searched. Id. at 705. The Court went so far as to adopt a general rule "that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the

15

occupants of the premises while a proper search is conducted." Id. (footnote omitted). The Court did not decide, however, whether this rule would apply if the warrant authorized a search for evidence rather than contraband, if the detention was "prolonged," or if other "special circumstances" existed. Id. at 705 nn.20-21.

In contrast to the circumscribed intrusion pr esented in Summers, the seizure involved in Dunaway v. New York "was in important respects indistinguishable from a traditional arrest." Dunaway, 442 U.S. at 212. Based on a tip that implicated Dunaway in a murder but did not provide probable cause for arrest, Dunaway "was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room," "where he was questioned by officers." Id. at 203, 212. He was never told that he was, nor was he, free to leave. Id. at 212. On the other hand, he was not booked or told that he was under arrest, and he would not have been arr ested had the interrogation proved fruitless. Id. The Court declined to treat Dunaway's seizure as a narrow intrusion that could be justified by law enforcement inter ests and individualized suspicion. Id. at 211-16. Instead, the Court concluded that Dunaway's detention without probable cause was unconstitutional, for "detention for custodial interrogation . . . intrudes so severely on interests pr otected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." Dunaway, 442 U.S. at 216.

B.

The seizure of Dr. Leveto falls somewher e between the detentions in Summers and Dunaway. Like the detention in Summers, Dr. Leveto's initial seizur e at the hospital might be viewed as merely an incremental intrusion, for the agents had a warrant to conduct a pervasive sear ch of his business, and it might be assumed that a manager would prefer to remain during the search. See Daniel, 808 F.2d at 1403.

However, other aspects of Dr. Leveto's detention were much more intrusive and resembled the detention in

16

Dunaway. The length of Dr. Leveto's detention--a total of eight hours--is itself highly significant. Furthermore, during the entire eight-hour period, Dr . Leveto was restricted in communicating with others, and during the six-hour period after he was brought back to the hospital from his home, he was interrogated. Furthermore, Dr. Leveto's detention at his place of business, in contrast to Summer's detention at home, arguably incr eased the stigma imposed by the agents' search, for it allowed co-workers to see how Dr. Leveto was being tr eated by the authorities and prevented Dr. Leveto fr om responding to client needs. Cf. Daniel, 808 F.2d at 1404 (suggesting that one could argue both that detention at one's business adds only minimally and that it adds significantly to the stigma of the search).

Moreover, Dr. Leveto's detention involved the inconvenience and indignity of a forced ride with IRS agents to his home and back to his office. The Supr eme Court recognized in Summers that a seizur e is more intrusive if it "involves moving the suspect to another locale." Summers, 452 U.S. at 700 n.12 (quoting 3 Wayne R. LaFave, Search and Seizure S 9.2, at 36-37 (1978)). Similarly, the Eighth Circuit has held that stopping someone thr ee to five miles from his home and taking him back in handcuf fs for the execution of a warrant is far more intrusive than the detention involved in Summers. United States v. Hogan, 25 F.3d 690, 693 (8th Cir. 1994); United States v. Boyd, 696 F.2d 63, 65 n.2 (8th Cir. 1982) (noting that Summers "certainly did not sanction the search and seizure of residents who, at the time of the search, are several blocks from their home"). But see Cochran, 939 F.2d at 339-40 (finding that seizure and return of a resident who "had driven a short distance from his home" was valid under Summers).

Finally, while it is unclear exactly how long the pr e-arrest detention lasted in Summers, the Court did not regard it as "prolonged," see 452 U.S. at 705 n.21, and Dr. Leveto's eight-hour detention undoubtedly qualifies as pr olonged under any reasonable understanding of that ter m. See Sharpe, 470 U.S. at 685 (recognizing the importance of brevity in appraising whether a seizure may be justified on

17

less than probable cause); Baker, 50 F .3d at 1192 (recognizing that prolonged detention may ripen into an arrest).

As Dr. Leveto's detention was significantly more intrusive than that in Summers, we might well conclude that Summers does not apply and that Dr. Leveto's seizure, like that in Dunaway, could be justified only on a showing of probable cause. See Dunaway, 442 U.S. at 211-16 (rejecting invitation to apply balancing test for narrow intrusions and holding that probable cause must exist to justify "detention for custodial interrogation"); Summers, 452 U.S. at 700 ("[T]he general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause."). But cf. United States v. Ritchie , 35 F.3d 1477, 1484 (10th Cir. 1994) (finding "no special circumstances showing that the intrusiveness of [the] . . . detention was sufficiently severe to preclude application of Summers" where suspect was detained as he was pulling out of his driveway and held for limited time during sear ch of his home); Bernstein v. United States, 990 F. Supp. 428, 441 (D.S.C. 1997) (citing Summers in holding that IRS agents who executed search warrants for evidence at home and business in approximately two and four hours, r espectively, "had the limited authority to detain the occupants at the premises while conducting the search of the premises"). At this stage of the proceedings, there is no suggestion that probable cause existed to seize Dr. Leveto, and consequently, if probable cause is necessary, Dr. Leveto's seizure would violate the Fourth Amendment.

We need not decide whether probable cause was required, however, because even under Summers' balancing approach for less intrusive seizures, Dr . Leveto's detention, as alleged, was unreasonable.6 We have already discussed

_____

6. The Court in Summers adopted the general rule "that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Summers, 452 U.S. at 705 (footnote omitted); see id. at 705 n.19; Ritchie , 35 F.3d at 1482, 1483-84. However, the Court explicitly acknowledged that this rule might not

18

the great intrusion on Dr. Leveto's Fourth Amendment interests that resulted from the agents' alleged conduct, and on the other side of the balance, it appears that Dr. Leveto's seizure did little to advance the law enforcement interests that were found to justify the detention in Summers.

A primary law enforcement interest served by such detention is the prevention of flight in the event that incriminating evidence is found during the sear ch. In this connection, the distinction between searches for contraband and searches for evidence is material. It is not uncommon for a search for contraband to pr oduce items that justify an immediate arrest of the owner or resident of the premises, and a person who anticipates that a search may imminently result in his or her arr est has a strong incentive to flee. By contrast, a search for evidence-- particularly complicated documentary evidence--is much less likely to uncover items that lead to an immediate arrest. Thus, even if the search is successful, the suspect may well remain at liberty for some time until the evidence is examined and an indictment is obtained. As a r esult, the incentive to flee is greatly diminished.

In Dr. Leveto's case, the agents sought evidence of a suspected tax evasion scheme. A search of this type is unlikely to produce an immediate arrest, and in this case, although the agents allegedly seized thousands of pages of documents and many computer files, neither Dr . Leveto nor

_____

apply "if the search warrant merely authorized a search for evidence," if the detention were prolonged, or if other special circumstances existed. Id. at 705 nn.20-21. The search warrants at issue here both sought evidence rather than contraband. Moreover , both Dr. Leveto and Mrs. Leveto were detained for a prolonged period. Accordingly, we cannot assume that Summers' general rule automatically applies. Instead, we apply the analytical approach used in Summers, balancing law enforcement interests and individualized suspicion against the intrusiveness of the seizure, to determine whether the Levetos' detentions were constitutional. See Heitschmidt v. City of Houston, 161 F.3d 834, 838 (5th Cir. 1998) (acknowledging that Summers rejected "a completely ad hoc approach," but applying Summers' balancing approach where the detention at issue was more severe than that in Summers).

19

his wife was arrested. See United States v. Schandl, 947 F.2d 462, 465 (11th Cir. 1991) (noting that tax evasion is a crime that is "generally only detected thr ough the careful analysis and synthesis of a large number of documents").

Similarly, there was no compelling need to detain Dr. Leveto to protect the safety of the agents. If the agents had been conducting an investigation into a type of of fense often accompanied by violence, detention for some length of time might have been reasonable. See Summers, 452 U.S. at 702; Torres, 200 F.3d at 185, 186 (quoting Summers, 452 U.S. at 702, for the proposition that nar cotics searches may erupt in "sudden violence or frantic ef forts to conceal or destroy evidence"); Baker, 50 F .3d at 1191 (noting that occupants of a residence subject to a drug raid"are likely to be armed"); Barlin, 686 F .2d at 87 (noting "the violent nature of narcotics crime") (quoting United States v. Vasquez, 634 F.2d 41, 43 (2d Cir . 1980)). By the same token, if the agents had possessed information that the Levetos were tied to a violent group or had violent backgrounds, detention for some period might have been justified. See Clay, 640 F.2d at 162 (knowledge that individual "previously had been engaged in serious criminal conduct" might justify pat down). Here, however, there is no evidence that such a threat existed. Dr . Leveto was under investigation for tax crimes, and the alleged facts do not suggest that he had any ties to violent organizations or a record of violence. Accordingly, it does not appear that there was any compelling safety reason for detaining him during the lengthy search.

Furthermore, Dr. Leveto's detention did little to advance the interest in orderly completion of the search. The agents apparently did not rely on Dr. Leveto to open locked doors or containers during the course of the search. Similarly, since Mrs. Leveto was at the Levetos' home, ther e was no apparent need for Dr. Leveto to be pr esent at the home to provide access.

Nor was Dr. Leveto's extended detention necessary to prevent the destruction of evidence. We recognize that Dr. Leveto conceivably could have returned to his home and destroyed or concealed evidence or instructed his wife to do so if the agents had not detained him and restricted his

20

ability to use the telephone. Cf. Bernstein, 990 F. Supp. at 433 (IRS agents, who were executing warrants at business and home, prevented suspect at business fr om calling girlfriend at home "due to safety and recor d destruction concerns."); Garavaglia v. Budde, 1994 WL 706769, at *3 & n.3 (6th Cir. 1994) (unpublished disposition) (noting that no authority was cited for "a clearly established right to make a telephone call . . . while being detained during a search pursuant to a warrant" and that "other cir cuits have suggested that no such right exists"). However , the warrants in this case were allegedly executed by a large group of agents, and thus it appears that the agents could have minimized this presumed risk by executing the warrants at the hospital and home simultaneously, rather than waiting to take Dr. Leveto from the hospital to his home before executing the warrant there. Moreover, once the searches of the home and hospital wer e both underway, the need to detain Dr. Leveto to prevent the loss of evidence was minimal. See United States v. Timpani , 665 F.2d 1, 2–3 (1st Cir. 1981) (agents reasonably barred the detainee from leaving or calling anyone during the first 45 minutes of a five–hour search "until other coor dinated searches were underway" to prevent premature war ning). Had Dr. Leveto attempted to disrupt the evidence at either site, the agents would have been present to intervene.

Finally, it is not clear that the agents had a sufficient "articulable and individualized suspicion" to justify even a brief detention of Dr. Leveto. Although the Supreme Court has found that such a suspicion exists when law enforcement officers have a valid warrant to search a home for contraband and the detainee is an occupant of the home, the Court has also noted that the same may not be true if the search warrant merely seeks evidence. See Summers, 452 U.S. at 703–05 & n.20. The Eleventh Circuit has addressed this issue and held that the rationale justifying detention based on the occupant's connection to the premises "is not applicable to a sear ch for evidence, because the existence of mere evidence, as opposed to contraband, on the premises does not suggest that a crime is being committed on the premises." Daniel, 808 F.2d at 1404; see also Ritchie, 35 F.3d at 1483 (recognizing "that in some instances the existence of a warrant based on

21

probable cause would not" provide an individualized suspicion of criminal activity); United States v. Rowe, 694 F. Supp. 1420, 1424 & n.2 (N.D. Cal. 1988) (r ecognizing "that a search for evidence will rar ely give rise to an individualized suspicion that the occupant is committing a crime on the premises," but noting exceptions to this rule). We agree with this reasoning as a general rule. In sum, even applying the balancing test used in Summers , Dr. Leveto's lengthy detention, as alleged in the Complaint, was not reasonable and constituted a violation of his Fourth Amendment rights.

Mrs. Leveto has likewise stated a claim of unr easonable seizure based on her lengthy detention. Mrs. Leveto's detention did not exhibit many of the characteristics of an arrest that were manifest in Dr. Leveto's seizure. However, her detention was distinguishable from the detention in Summers in that she was detained for a pr olonged period-- approximately 6 hours--during a search for evidence. Accordingly, her seizure appears to have been significantly more intrusive than that in Summers.

On the other side of the balance, the law enfor cement interests that might justify her detention wer e less weighty than were the law enforcement inter ests in Summers. As with Dr. Leveto, the interest in pr eventing flight was minimal, and the risk of harm to the agents was smaller than it is in cases, such as Summers, in which the crime under investigation is one that is often associated with violence and in which the search may well r esult in an immediate arrest. Cf. Summers, 452 U.S. at 702. Nor do the allegations in the Complaint suggest that Mrs. Leveto's presence advanced the orderly completion of the search.

Because Mrs. Leveto's detention was more intrusive than that in Summers but was not supported by commanding law enforcement interests or individualized suspicion, we conclude that the ruling in Summers does not extend to Mrs. Leveto's seizure. Her seizure could only be justified on probable cause. Since there is no suggestion that the agents had probable cause to detain Mrs. Leveto, we hold that Mrs. Leveto has stated a claim for unconstitutional detention.

22

C.

Again, however, we are compelled to conclude that a reasonable agent could have believed, in light of the case law at the time, that the detentions of Dr. Leveto and Mrs. Leveto were lawful.

Because Dr. Leveto's experience fell somewher e between the situations in Dunaway and Summers , a reasonable officer could have concluded that Dr. Leveto's detention would be governed by the Summers' holding. As noted, the Court in Summers adopted the general rule"that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Summers, 452 U.S. at 705 (footnote omitted). While the Court did not extend this rule to cases involving searches for evidence or cases featuring pr olonged detention, the Court also did not foreclose such extensions. See id. at 705 n.20 ("We do not decide whether the same result would be justified if the sear ch warrant merely authorized a search for evidence."); id. at 705 n.21 ("[S]pecial circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case . . . ."). Nor did the Court decide whether transporting a suspect would change the result. See id. at 700 n.12 ("[M]oving the suspect to another locale""might cast doubt upon the reasonableness of the [T erry-type] detention."). After Summers, other courts acknowledged, but did not resolve, these issues. See Torr es, 200 F.3d at 185 (Supreme Court indicated in Summers, 452 U.S. at 705 n.21, that detention might be unlawful "in an `unusual case' involving `special circumstances, or' " if pr olonged); Pecsi v. Doyle, 1991 WL 137597, at *2 n.1 (6th Cir. 1991) (unpublished disposition) (leaving "a definitive resolution of the evidence/contraband distinction for another day"); Rowe, 694 F. Supp. at 1424-25 (applying Summers' reasoning to a search for evidence, but declining to suggest"a blanket extension of the Summers rule to all cases involving searches for evidence"). Moreover , lower courts suggested that rather lengthy detentions would fall within Summers' purview. See Daniel, 808 F.2d at 1405 ("Since the dissenters in Summers expressly raised the point, the

23

Summers majority apparently appreciated that the concept of detention during searches of premises entails the prospect of detentions lasting several hours."); Rowe, 694 F. Supp. at 1424 ("Although the Summers Court did not define the duration of permissible detention, it apparently contemplated that occupants could be detained long enough for police to complete extensive sear ches."). Moreover, dicta in opinions of this Court and others occasionally described the scope of the authority to detain pursuant to Summers in sweeping terms. See Torres, 200 F.3d at 185 ("The Supreme Court has held that officers executing a search warrant lawfully may r estrain persons present at the searched premises."); Baker, 50 F.3d at 1191 ("Under Michigan v. Summers, during execution of a search warrant, police can detain the occupant of the house they have a warrant to search.") (citation omitted); Rivera, 928 F.2d at 606 ("Absent special circumstances, the police of course have the authority to detain occupants of pr emises while an authorized search is in progr ess, regardless of individualized suspicion."). Accordingly, at the time the agents acted, the breadth of the Summers rule was highly uncertain.

In light of this uncertainty, a reasonable officer could have concluded that the extended detention of Dr . Leveto, including his conveyance to and from his home, was an appropriate incident to the execution of the warrant at the hospital. See Wilson, 526 U.S. at 617 ("Given such an undeveloped state of the law, the officers in this case cannot have been `expected to predict the future course of constitutional law.' ") (quoting Pr ocunier v. Navarette, 434 U.S. 555, 562 (1978)). Similarly, a reasonable officer could have concluded that the Summers rule would govern Mrs. Leveto's detention at home, rendering her detention lawful. See Summers, 452 U.S. at 705 n.19.

We are therefore requir ed to hold that the agents were entitled to qualified immunity on the Levetos' unr easonable seizure claims. Our holding is consistent with those of other courts. See Daniel, 808 F.2d at 1403-05 (finding defendant agents entitled to qualified immunity where law was uncertain as to permissible length of detention and applicability of Summers to searches for evidence rather

24

than contraband); Garavaglia, 1994 WL 706769, at *2–*3 (qualified immunity properly granted to IRS agent on claim of unconstitutional, six-hour detention at business premises pursuant to search warrant for evidence of tax evasion as neither Supreme Court nor Sixth Cir cuit had determined whether Summers would apply to search for evidence, rather than contraband). But cf. Heitschmidt, 161 F.3d at 839 (recognizing that Summers did not decide whether probable cause was necessary for detention pursuant to a search for evidence, declining to give the law enforcement interests identified in Summers any significant weight, and denying qualified immunity at the pleading stage on plaintiff 's unreasonable detention claim); Mena v. City of Simi Valley, 226 F.3d 1031, 1039–41 (9th Cir. 2000) (where officers may have exceeded scope of pr oper search and thereby extended length of detention, denial of qualified immunity at summary judgment stage was proper); Pecsi, 1991 WL 137597, at *3 (Because the Sixth Circuit could not tell at the summary judgment stage whether "a five to six hour detention [was unduly prolonged] when the items listed in the affidavit may well have been in plain view" and because "[c]learly established law requires that `the officers r emain on the premises only so long as is reasonably necessary to conduct the search,' " the defendants were not yet entitled to qualified immunity.).

V.

Having concluded that the District Court properly dismissed the claims arising from the Levetos' pat down and detention, we address one final claim. In their Complaint, the Levetos allege that the closur e of Dr. Leveto's business during the search violated the Fourth Amendment. To the extent that this claim r elies on the restrictions placed on Dr. Leveto, those restrictions were considered in finding that his detention was unreasonable. At this point, we focus on whether the overall inter ference with the hospital's operation led to an unreasonable search. We have located little authority directly on point.

One district court, however, has addr essed the issue. In Bernstein v. United States, IRS agents simultaneously executed search warrants at the home and business of a

25

man suspected of filing false tax retur ns. Bernstein, 990 F. Supp. at 432. At the business--a delicatessen--"[a]ll customers or employees were asked to leave and the business was closed for the duration of the [four -hour] search." Id. at 432, 433. Accor ding to a declaration submitted in the case, closure was "the established procedure in search warrants involving businesses open to the public." Id. at 432. The court found that plaintiff had failed to state a claim based on closure of the business because "[t]here is certainly no constitutional right to not have federal agents temporarily close a business site pursuant to a search warrant in a criminal investigation." Id. at 437; see also id. at 441 ("There is no constitutional right to have an investigative agency conduct a criminal search after business hours or at a mor e convenient time."); O'Ferrell v. United States, 968 F . Supp. 1519, 1535 (M.D. Ala. 1997) (noting in the context of the discr etionary function exception to federal tort liability that "constitutional law does not specifically pr ohibit" the closing of a business during a search). Thus,"[t]he fact that the customers were requested to leave and that the site was temporarily closed [did] not pose constitutional issues." Bernstein, 990 F. Supp. at 441.

We do not agree with the Ber nstein court's analysis. For present purposes, we must assume that the sole authority upon which the defendants in this case relied when they restricted the normal operation of the veterinary hospital was the authority conferred by the warrants that they were executing, and those warrants merely authorized the defendants to search for and seize evidence of certain federal crimes. It necessarily follows that any authority that the defendants possessed to restrict the operation of the veterinary hospital derived from the authority to search for and seize the evidence in question and that the scope of their authority to restrict the hospital's operation was no broader than was necessary to permit the search and seizure to be carried out in an effective, safe, and reasonably expeditious fashion. There may be circumstances in which a search warrant for a place of business cannot be executed properly unless the business is entirely shut down for at least a brief time, but the allegations of the Complaint do not establish the existence

of such circumstances. Consequently, we hold that the closure of the hospital, as alleged in the Complaint, was unlawful.

Once again, however, we are constrained to hold that the defendants are entitled to qualified immunity. The unlawfulness of shutting down a business simply because a search warrant was being executed on the pr emises was not clearly established at the time of the sear ch in this case and, indeed, as noted, the scant authority on this point appeared to support the lawfulness of the defendants' conduct. Cf. Wilson v. Layne, 141 F .3d 111, 115–16, 118–19 & n.11 (4th Cir. 1998) (finding officers entitled to qualified immunity where the law was not clearly established and officers could have believed their conduct justified by legitimate law enforcement interests), aff 'd, 526 U.S. 603, 617, 618 (1999) (affirming grant of qualified immunity given "undeveloped state of the law"); Enlow v. Tishomingo County, 1990 WL 366913, at *9 (N.D. Miss. 1990) (Where officials seized a business "for five days because they thought the premises was the site of illegal gambling," qualified immunity was available because "a r easonable officer could have thought probable cause existed.").

VI.

Because this case comes to us on appeal from a dismissal under Fed. R. Civ. P. 12(b)(6), we know only what the plaintiffs allege that the defendants did when the warrants were executed; we have no idea what facts would have emerged if we knew the defendants' side of the story or if the case had been tried. However, if the plaintiffs' allegations are true, the warrants in this case were executed in a manner that violated the Fourth Amendment. Nevertheless, because of uncertainty in the case law at the time of the events in question, we affirm the decision of the District Court on qualified immunity grounds. See Brown, 922 F.2d at 1118–19 (recognizing that the clearly established requirement "may pr oduce distressing results," but finding defendants entitled to qualified immunity).

27

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

28